# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **OCTOBER 2024**     **03234** |
| E-Filing Number: 2410054618 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| TERESA SEIDMAN | HAMILTON BEACH BRANDS, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 6312 CROMBIE STREET<br>PITTSBURGH PA 15217 | 4421 WATERFRONT DRIVE<br>GLEN ALLEN VA 23060 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ELIMELECH SEIDMAN | AMAZON.COM, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 6312 CROMBIE STREET<br>PITTSBURGH PA 15217 | 440 TERRY AVENUE NORTH<br>SEATTLE WA 98109 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 2 | [X] Complaint    [ ] Petition Action    [ ] Notice of Appeal<br>[ ] Writ of Summons    [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS |
|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration    [ ] Mass Tort    [ ] Commerce    [ ] Settlement<br>[X] Jury    [ ] Savings Action    [ ] Minor Court Appeal    [ ] Minors<br>[ ] Non-Jury    [ ] Petition    [ ] Statutory Appeals    [ ] W/D/Survival<br>[ ] Other: _____ |

**CASE TYPE AND CODE**

2P – PRODUCT LIABILITY

**STATUTORY BASIS FOR CAUSE OF ACTION**



| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | **FILED<br>PRO PROTHY**<br><br>OCT **24** 2024<br><br>**L. BREWINGTON** | YES     NO |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>TERESA SEIDMAN , ELIMELECH SEIDMAN</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| MATTHEW B. SIMON | ONE OXFORD CENTRE, 35TH FL<br>301 GRANT STREET<br>PITTSBURGH PA 15219 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (412)338-4682 | (412)391-8758 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 331106 | SIMON@MARCUS-SHAPIRA.COM |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *MATTHEW SIMON* | Thursday, October 24, 2024, 12:36 pm |

FINAL COPY (Approved by the Prothonotary Clerk)



**IN THE COURT OF COMMON PLEAS**
**OF PHILADELPHIA COUNTY, PENNSYLVANIA**

TERESA SEIDMAN and ELIMELECH
SEIDMAN,

        Plaintiffs,

    v.

HAMILTON BEACH BRANDS, INC. and
AMAZON.COM, INC.,

        Defendants.

) CIVIL DIVISION
)
) No.
)
)
)
) **COMPLAINT IN CIVIL ACTION**
)
)
) Filed on behalf of Plaintiffs,
) Teresa Seidman and Elimelech Seidman
)
) Counsel of Record for this Party:
)
) Scott D. Livingston, Esq.
)   PA ID No. 60649
) Matthew B. Simon, Esq.
)   PA ID No. 331106
)
) MARCUS & SHAPIRA LLP
) Firm No. 145
) One Oxford Centre, 35th Floor
) 301 Grant Street
) Pittsburgh, PA 15219-6401
) Telephone: 412-471-3490
) Facsimile: 412-391-8758
) Email: livingston@marcus-shapira.com
)         simon@marcus-shapira.com
)
)
)
)
)
) **JURY TRIAL DEMANDED**
)
)
)
)
)
)

Case ID: 241003234

**IN THE COURT OF COMMON PLEAS**
**OF PHILADELPHIA COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TERESA SEIDMAN and ELIMELECH SEIDMAN, | ) ) ) | Civil Action No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| HAMILTON BEACH BRANDS, INC. and AMAZON.COM, INC. | ) ) ) ) | |
| Defendants. | ) | |

**NOTICE TO DEFEND**

<table>
<tr><td align="center"><b>NOTICE</b></td><td align="center"><b>AVISO</b></td></tr>
<tr><td>

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

</td><td>

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

</td></tr>
<tr><td align="center">

**Philadelphia Bar Association**
**Lawyer Referral and Information Service**
**1101 Market St., 11th Floor**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**

</td><td align="center">

**Asociacion De Licenciados De Filadelfia**
**Servicio De Referencia E Informacion Legal**
**1101 Market Street, 11th Piso**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333**

</td></tr>
</table>

Case ID: 241003234

**IN THE COURT OF COMMON PLEAS**
**OF PHILADELPHIA COUNTY, PENNSYLVANIA**

TERESA SEIDMAN and ELIMELECH
SEIDMAN,

        Plaintiffs,

        v.

HAMILTON BEACH BRANDS, INC.
and AMAZON.COM, INC.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

JURY TRIAL DEMANDED

**COMPLAINT IN CIVIL ACTION**

For their complaint against Defendants Hamilton Beach Brands, Inc. ("Hamilton") and Amazon.com, Inc. ("Amazon") (together, "Sellers"), Plaintiffs Teresa Seidman ("Mrs. Seidman") and her husband Rabbi Elimelech Seidman ("Rabbi Seidman") allege as follows:

**Introduction**

1.     After observing the Sabbath with her family, Mrs. Seidman suffered severe burns when the plastic handles on her 45 Cup Coffee Urn and Hot Beverage Dispenser (Hamilton Model: 40515R) (the "Urn") detached during a catastrophic failure that occurred without warning. The Urn was manufactured and designed by Hamilton but sold to Mrs. Seidman by Amazon.

2.     When the Urn's plastic handles completely detached, it dropped to the floor, striking Mrs. Seidman and splashing her lower body with boiling hot water.

3.     The Urn's failure caused Mrs. Seidman to suffer severe second degree burns that set in motion a long painful life-altering journey for Mrs. Seidman that continues to this day.

4.     Early on, Mrs. Seidman required two surgeries during a two-week hospital stay to address her injuries. But that was only the beginning. Since then, Mrs. Seidman has endured months of excruciating pain that no drug could alleviate, countless medical appointments and

Case ID: 241003234

treatments, and severe limitations on her activities that adversely impact her quality of life. As a result of the horrific burns she suffered, Mrs. Seidman's life will never be the same.

5.    What makes Mrs. Seidman's injuries all the more tragic is that Sellers knew that the Urn's handles were defective and prone to failure in precisely the manner that they failed. Hamilton knew from expert testing performed in connection with a prior lawsuit involving the same Urn model and mode of failure that it was just a matter of time before another purchaser of that model was severely injured. Unfortunately, that purchaser turned out to be Mrs. Seidman.

6.    Amazon likewise knew from product reviews on its website and the prior public lawsuit against Hamilton that the Urn was a ticking time bomb yet it continued to sell the Urn without any mention to its customers that the handles could fail.

7.    All in the name of profit, Sellers did nothing to warn the public or initiate a product recall despite knowing the Urn's propensity to fail and the resulting risk of severe burns from such failure. Their conduct was unforgivable. It more than justifies an award of punitive damages against them under Pennsylvania law.

8.    Mrs. Seidman and Rabbi Seidman seek compensatory and punitive damages for the grave injuries that Sellers inflicted on Mrs. Seidman merely to line their corporate pockets at her expense.

### Jurisdiction and Venue

9.    This Court has subject matter jurisdiction over this action pursuant to 42 Pa.C.S. § 931.

10.   This Court has personal jurisdiction over Sellers pursuant to 42 Pa.C.S. § 5301.

11.   Venue is proper in this Court pursuant to Pa.R.C.P. § 2179(a) because Sellers regularly and routinely conduct business in Philadelphia County.

Case ID: 241003234

**Parties**

12.    Mrs. Seidman and Rabbi Seidman are adult individuals and Pennsylvania residents. They reside at 6312 Crombie Street, Pittsburgh, Pennsylvania 15217.

13.    Defendant Hamilton is a corporation organized and existing under the laws of Delaware whose principal place of business is located at 4421 Waterfront Drive, Glen Allen, Virginia 23060.

14.    Hamilton is authorized to and does business throughout the Commonwealth of Pennsylvania. At all relevant times, Hamilton purposely established significant contacts in Pennsylvania and was engaged in substantial, continuous, regular, and systematic business in the County of Philadelphia.

15.    Hamilton designed, manufactured, assembled, tested, labeled, inspected, marketed, distributed, monitored, promoted, and sold the Urn that is the subject of this lawsuit.

16.    Hamilton is a publicly traded company with approximately $625 million in sales in 2023 and a market capitalization of approximately $375 million.

17.    Defendant Amazon is a corporation organized and existing under the laws of Delaware whose principal place of business is located at 440 Terry Avenue North, Seattle, Washington 98109.

18.    Amazon is authorized to and does business in the Commonwealth of Pennsylvania. At all relevant times, Amazon purposely established significant contacts in Pennsylvania and was engaged in substantial, continuous, regular, and systematic business in the County of Philadelphia.

19.    Amazon marketed, distributed, promoted, and ultimately sold the Urn to Mrs. Seidman.

3

Case ID: 241003234

20.     Amazon had total revenue in 2023 of approximately $575 billion and a market capitalization of approximately $1.9 trillion.

**Sellers Knew the Urn Was Defective**

21.     Sellers knew that the Urn had several fundamental defects that posed a high risk of potentially grave harm to customers.

22.     In 2022, Hamilton was sued by a customer who suffered serious lower extremity burns under nearly identical circumstances. *See* Notice of Removal, *Bezalel v. Hamilton Beach Brands, Inc.*, 22cv6536 (Oct. 27, 2022), ECF No. 1, Ex. A (*Bezalel* Complaint); Ex. D (*Bezalel* Demand Letter). The *Bezalel* Complaint and Demand Letter are attached as Exhibits 1 and 2 respectively.

23.     In *Bezalel*, plaintiff Mina Bezalel alleged that she was using the Urn during the last two days of the Passover holiday during which the rules of the Sabbath are observed. *Bezalel* Demand Letter at 2.

24.     As with Mrs. Seidman, Mrs. Bezalel was severely burned when the Urn's plastic handles suffered a sudden catastrophic failure while she was carrying the Urn full of scalding liquid to the kitchen sink. *Id.* at 2-3.

25.     Mrs. Bezalel retained a materials science expert, Dr. James Glancey of the University of Delaware, to test her Urn and potentially provide expert testimony in her case. *Id.* at 3-5.

26.     Dr. Glancey's evaluation of Mrs. Bezalel's Urn revealed several elemental design defects that were communicated to Hamilton in a settlement demand letter. *Id.*

27.     Shortly after Mrs. Bezalel filed her lawsuit, Hamilton settled for an undisclosed amount. *Bezalel*, ECF No. 17.

Case ID: 241003234

28.    The design defects identified by Dr. Glancey were so glaringly obvious that any competent engineer, manufacturer, or seller would have been aware of them *ab initio*.

29.    But, even if Sellers had managed to remain willfully ignorant of the Urn's plainly defective design, they were made acutely aware during the *Bezalel* action of the Urn's egregious design defects and the grave risk of harm it posed to users.

30.    Nonetheless, Sellers took no action to warn consumers or recall the defective Urn. Indeed, Sellers continue to sell the Urn to this day without any modification to its defective design or warning to users of the risk that its handles could suddenly fail. In other words, Sellers made a conscious decision to put profits over the health and safety of their customers.

31.    Worse yet, the Bezalel tragedy was not the only catastrophic failure of the Urn's handles before Mrs. Seidman became a victim herself of its defective design.

32.    An Amazon reviewer, who had purchased the Urn, posted on June 18, 2023 that she was "moving the urn filled with hot water when the plastic handle broke causing the urn to fall throwing hot water EVERYWHERE missing my daughter by inches!!"

33.    Another Amazon review commented on April 2, 2024 that the "[h]andle [of the Urn] broke [on the] first use."

### The Urn's Sudden Catastrophic Failure

34.    Though Sellers knew about these prior catastrophic failures, Mrs. Seidman had no such knowledge when, on Friday, November 10, 2023, Mrs. Seidman plugged the Urn into an electrical outlet to heat hot water for tea and instant coffee during the Sabbath.

35.    After the close of the Sabbath, on Saturday, November 11, 2023, Mrs. Seidman unplugged the Urn and picked it up using its plastic handles to bring it to the kitchen sink to empty out the scalding hot water.

36.    The Urn's lid was securely fastened as Mrs. Seidman carried it to the sink.

Case ID: 241003234

37. But suddenly, and without warning, the Urn's plastic handles completely detached causing the Urn to drop to the floor in an instant. On the way to the ground, the Urn struck Mrs. Seidman's left foot, which caused its scalding hot water to spill onto her left leg. Mrs. Seidman suffered severe burns that were directly caused by the failure of the Urn's handles.

38. Unfortunately, Mrs. Seidman has Type 1 diabetes, which made her injuries even more severe and their healing even more problematic to this day.

**Mrs. Seidman's Medical Treatment**

39. After being hit with near boiling hot water on her lower extremities, Mrs. Seidman immediately experienced intense pain in her left foot and leg that, not unsurprisingly, caused her to scream out in pain.

40. The screams alerted her husband, Rabbi Seidman, who was downstairs at the time. After Rabbi Seidman arrived in the kitchen, he helped Mrs. Seidman remove her clothing from the affected area where he applied cool compresses.

41. Despite their efforts, Mrs. Seidman remained in agonizing pain and the affected area began to severely blister. Rabbi Seidman quickly realized that his wife needed immediate medical attention, so he drove her to an urgent care clinic where her wounds were treated with Silvadene cream.

42. But, even with the best efforts of the urgent care physicians, Mrs. Seidman's condition took a turn for the worse with large, painful blisters continuing to form on her toes, left leg, and right thigh. One blister on her toe burst and became infected.

43. On November 14, 2023, at the referral of the urgent care clinic, Mrs. Seidman went to the emergency room at the University of Pittsburgh Medical Center ("UPMC") Mercy. Mrs. Seidman presented with a seven-inch, fluid filled blister on her left shin, a two-inch blister on her right thigh, a one-centimeter blister on one left toe, and an open wound on her left big toe.

6

Case ID: 241003234

44. After being evaluated in the Emergency Department, Mrs. Seidman received intravenous antibiotics, underwent an x-ray and laboratory tests, and, given the nature of her injuries, was eventually transferred to the burn unit.

45. At the burn unit that same day, Mrs. Seidman was seen by Alain Corcos, MD and Justin Barry, PA-C. They diagnosed Mrs. Seidman with numerous second-degree burns across her left leg, left foot, and right thigh.

46. The burn-unit physicians removed the fluid filled blisters and damaged tissue from her wounds, which revealed dead tissue and clear signs of cellulitis—a bacterial skin infection. After her wounds were treated with various prescription antibiotics and ointments and wrapped, Mrs. Seidman was discharged.

47. Mrs. Seidman was advised to follow up in one week for reevaluation. Before that appointment, Mrs. Seidman had to remove the dressing from her most serious wounds daily, aggressively wash the affected areas, and re-dress her wounds—a painful process that repeatedly resulted in bleeding and the removal of the damaged tissue.

48. But, despite all this daily care, Mrs. Seidman's condition continued to deteriorate while she was at home. Her pain became so significant that even walking was a struggle. Something had to be done.

49. On November 16, 2023, Mrs. Seidman had a telephone consultation with PA Barry, who prescribed her an oral opioid pain medication to help with the pain.

50. On November 18, 2023, Mrs. Seidman returned to the hospital burn unit in a terrible condition. Her pain had once again taken a turn for the worse and she had even larger areas of infection. Mrs. Seidman was immediately treated with intravenous antibiotics and opioid pain medications and admitted to the hospital for two weeks.

Case ID: 241003234

51. Due to the severity of her burns and fear that her left big toe might need to be amputated, Mrs. Seidman's physicians required her to stay at the hospital and undergo two surgeries: a skin graft surgery using cadaver tissue to prepare the site followed by a final skin graft surgery using healthy tissue from her left thigh.

52. On November 21, 2023, instead of preparing for Thanksgiving with her family, Mrs. Seidman underwent the burn excision and skin graft surgery using cadaver tissue.

53. As a result of the surgery, Mrs. Seidman suffered another round of pain and treatments.

54. Desperately seeking pain relief two days after her surgery, Mrs. Seidman had a consultation with the acute interventional post operative pain services ("AIPPS") physician, Andrew Phan, MD.

55. Mrs. Seidman complained of unrelenting pain that was exacerbated by movement and was judged by her as a nine on a scale of ten. Dr. Phan increased her opioid pain medications to help relieve Mrs. Seidman's excruciating discomfort.

56. On November 27, 2023, Mrs. Seidman underwent a second surgery that removed the cadaver skin graft and replaced it with a skin graft from her own tissue, which was taken from her left thigh.

57. The second surgery set in motion another round of post-operative pain and treatment, including treatment to the new donor site wound on her left thigh.

58. During her hospital stay, Mrs. Seidman received daily hydrotherapy and dressing changes, intravenous and oral opioid pain medications for pain and post-operative pain, antibiotics to treat skin infections, and podiatry consultations to address the significant wound on her left foot.

8

Case ID: 241003234

59.    During this time, Mrs. Seidman, who has Type 1 diabetes with hypothyroidism, had difficulty controlling her blood sugar levels due in part to her decreased appetite. As a result, Mrs. Seidman also consulted regularly with an endocrinologist, Karen Selk, DO, to adjust her insulin pump settings and thyroid medication.

60.    Mrs. Seidman's condition finally stabilized enough for her to resume treatment from home after she was discharged from the hospital on December 1, 2023. At that time, Mrs. Seidman was prescribed oral opioid medications and antibiotics for a skin infection at the donor site.

61.    On December 5, 2023, Mrs. Seidman had a follow-up appointment at UPMC Mercy. At that appointment, the staples securing Mrs. Seidman skin graft were finally removed, her wounds were treated and dressed, and she was again advised to change her dressing daily.

62.    The following images show the condition of Mrs. Seidman's injury near the time of her December 5 appointment. *See* Images 1-4.

**Images 1-4: Mrs. Seidman's Injuries in December 2023**



9

Case ID: 241003234



63.     Mrs. Seidman spent the weeks following her surgery as a shut-in with Rabbi Seidman, confined to her home and unable to do even the most minimal tasks. For nearly six weeks, Mrs. Seidman could not take showers due to the dressings on her wounds, could not sleep through the night due to her pain, and could not leave her house other than for medical appointments. This meant that, despite being a devout practicing member of the Jewish faith, the Seidmans could not go to weekly services at their synagogue as a couple.

64.     During this time, Mrs. Seidman had to rely on Rabbi Seidman and family members that traveled to Pittsburgh to take care of her while she began her long road to recovery. Because their insurance did not cover home nursing care, Rabbi Seidman was trained to dress Mrs. Seidman's wounds, and he cared for her injuries daily. Rabbi Seidman also helped clean Mrs. Seidman's hair and took over many of the household tasks, including house cleaning, grocery shopping, and meal preparation.

65.     To add insult to her injuries, these long weeks of recovery robbed Mrs. Seidman and Rabbi Seidman of their long-anticipated vacation to California to visit their children and other family members. It was supposed to be a three-month cross-country trip beginning in early December 2023 highlighted by Rabbi Seidman's 70th birthday celebration with the family.

Case ID: 241003234

66. In January 2024, nearly two months after suffering her severe burns, Mrs. Seidman finally began to experience some improvement in her wounds but she was still not close to being herself.

67. Even today, Mrs. Seidman suffers from significant physical limitations due to her injuries—including difficulty walking for more than short distances.

68. Before the incident, Mrs. Seidman would walk several miles daily and enjoyed step aerobics almost every day. Her injuries have made those activities impossible.

69. As expected, Mrs. Seidman also has large permanent scars from her burns and to this day she must constantly wear an uncomfortably tight compression garment over her leg. This must be worn for twelve to eighteen months. *See* Images 5-6.

**Images 5-6: Mrs. Seidman's Scarred Leg**



70. Understandably, Mrs. Seidman's severe injuries have taken a huge toll on her emotionally and psychologically. She is frustrated, angry, stressed, and depressed from all that she

11

Case ID: 241003234

has gone through. And the activities Mrs. Seidman once did to help her cope with those emotions are no longer possible or even appealing.

71.    Mrs. Seidman's burns also exacerbated her underlying health conditions and resulted in new concerns. Mrs. Seidman, for example, finds that, due to the pain in her left leg, she must overcompensate with her right leg while walking, resulting in terrible sciatica that lasted for weeks.

72.    Worse still, Mrs. Seidman's burn injuries prevented her from getting much needed timely treatment for periodontal disease caused by her Type 1 diabetes. Because of her burn injuries, Mrs. Seidman was unable to seek treatment for her periodontal disease. Missing a critical, preventative periodontal appointment had terrible consequences. By the time Mrs. Seidman was finally able to seek treatment for her periodontal disease, the disease had progressed to where she had to undergo an invasive procedure under anesthesia and have two teeth pulled to address the issue.

73.    At Mrs. Seidman's age, these secondary effects from her burns will only get worse, not better, as time progresses. Mrs. Seidman will never fully recover from her burn injuries and their consequential impact on her health and well-being.

**The Defective Urn**

74.    Mrs. Seidman purchased the Urn on December 21, 2020 from Amazon.com.

75.    According to Mrs. Seidman's sales receipt, the Urn was "sold" and "deliver[ed]" by Amazon.

76.    The Urn is a 45-cup capacity electric coffee and hot water urn manufactured and designed by Hamilton.

12

Case ID: 241003234

77.    The Urn heats 45-cups of water or other beverages, keeps these beverages at extremely hot temperatures for extended periods, and dispenses hot water using a small lever at the bottom.

78.    The Urn consists of a large metal tank with a pour spout on the bottom, two plastic carrying handles on either side, and a lid on top. *See* Image 7.

**Image 7: Image of Product**



79.    According to Hamilton's marketing on the Urn's Amazon page, the handles "stay cool to the touch for comfort." *Hamilton Beach 45 Cup Coffee Urn and Hot Beverage Dispenser, Silver*, Amazon.com (last visited Aug. 15, 2024), https://bit.ly/3VgaTAQ. The Urn's lid is secured in place by the plastic handles. On the Urn's Amazon page, Hamilton falsely represents that the Urn's lid "locks in place to eliminate spills," when, in fact, the lid does not prevent spills if the plastic handles suffer a catastrophic failure.

80.    Through its "stay cool" and "eliminate spills" claims, Hamilton assures consumers, like Mrs. Seidman, that the Urn can be safely carried with scalding hot water or liquid.

13

Case ID: 241003234

81.     Hamilton does not warn consumers against carrying the Urn while it contains hot liquid in any of its marketing or other materials. This is hardly surprising given that carrying the Urn while it contains scalding hot liquid is a necessary and highly foreseeable use of the Urn. But unfortunately, due to its several fundamental and known design defects, using the Urn in this foreseeable manner is extremely dangerous.

82.     After becoming another victim of Hamilton's knowingly defective design, Mrs. Seidman retained a materials science expert, Dr. James Glancey, who also served as an expert in the *Bezalel* case. Dr. Glancey has identified three glaring product defects that caused the Urn to fail that could have been easily avoided by simple economically feasible alternative designs which, in turn, would have prevented Mrs. Seidman's severe injuries.

83.     To begin with, the Urn's handles are secured by two small screws, which pass through the Urn's metal walls and into prefabricated ports in the plastic handles. According to Dr. Glancey, the screws overstress the plastic and induce failure in the handle structure.

84.     A simple alternative design, such as using a nut, bolt, and washer arrangement would have safely secured the handles to the Urn and avoided this tragedy. *See* Image 8.

**Image 8: Competitor's Product with Nut and Bolt Design**



14

Case ID: 241003234

85.    Equally troubling, testing conducted by Dr. Glancey revealed that Hamilton used non-reinforced polypropylene for the handles, even though polypropylene is not able to withstand the high temperatures to which the handles would be, by design, regularly subjected.

86.    Polypropylene's inability to withstand temperatures in excess of 180 degrees Fahrenheit is widely known throughout the industry. It is a fact easily accessible from a quick Google search for "polypropylene heat tolerance," the first result of which is an article that states, "[p]olypropylene . . . begins to lose strength at 180°F." *Choosing a Heat-resistant Plastic*, Protolabs, https://bit.ly/4dIYmw2.

87.    Yet Hamiliton selected polypropylene knowing that this plastic would degrade prematurely when exposed to the high temperatures (in excess of 180 degrees) that the handles must routinely endure. As a result of the degradation that occurs to the plastic at high temperatures, the prefabricated ports in the handles eventually become unable to properly anchor the screws leading to sudden failure.

88.    Dr. Glancey's report confirms that polypropylene's strength substantially decreases at temperatures above 180 degrees Fahrenheit, well below the 211 degrees Fahrenheit temperature that the exterior of the Urn reaches when heating water to near boiling.

89.    As this image makes plain, the Urn's handles—including the prefabricated ports and other portions—degraded significantly to the point where the handles detached from the Urn. *See* Images 9-10.

15

Case ID: 241003234

**Images 9-10: Mrs. Seidman's Urn's Left ("H.L.") and Right ("H.R.") Handles**



90.     If Sellers used a thermoplastic material rated for the high temperatures that they knew the Urn would be exposed to, the Urn's handles would not have failed and, as such, Mrs. Seidman would not have been injured.

91.     The Urn also was not designed with a fail-safe lid despite Sellers' representations to the contrary. This is because the lid locking feature is secured in place by the handles. As a result, when the defectively designed handles fail, the lid itself also immediately fails. In other words, when the handles fail, the lid locking system also necessarily fails, permitting the Urn's scalding hot liquid to escape.

92.     If Sellers had designed a secondary locking feature or one not reliant on its defective handle design, again, Mrs. Seidman never would have been injured. *See* Image 11.

16

Case ID: 241003234

**Image 11: Similar Product with "Twist Lid"**



93.    Sellers did none of these things. Instead, Sellers sold and continue to sell an unreasonably dangerous product that places its customers at high risk for severe burns. Mrs. Seidman is one of those customers and her injuries directly resulted from these product defects.

94.    With this conduct, Hamilton not only directly misled consumers, but it violated its purported core principles and promises to its customers. On its website, Hamilton claims to place "customer focus" at the top of its "Good Thinking Culture" and to have a "passion for quality," a commitment to "honest, ethical behavior," and an "obsession" with customer satisfaction. Yet the reality is just the opposite. With profits first and the safety and health of its customers not even making the list. *See* Images 12-13.

17

Case ID: 241003234

**Images 12-13: Screenshots from Hamilton's Public Website**





**Punitive Damages Liability**

95.    Mrs. Seidman's tragic injuries should never have happened. They were entirely preventable. This tragedy occurred only because of obvious fundamental design flaws that were easily fixable.

96.    To this end, Sellers squandered their first opportunity to prevent Mrs. Seidman's horrific injuries by remedying the Urn's extraordinarily egregious design defects before manufacturing began by doing nothing.

97.    Sellers squandered a second chance to prevent Mrs. Seidman's horrific injuries in 2022 despite being made keenly aware by the *Bezalel* action of the Urn's defects and the grave risk they posed to consumers. Sellers again did nothing.

Case ID: 241003234

98.    Sellers squandered their third opportunity to prevent this tragedy in 2023 when, despite learning from an Amazon review that the Urn had catastrophically failed for another customer in the same way, they did nothing.

99.    Through their repeated inaction, Sellers have made clear to the public that their profits are all that matter to them.

100.    This corporate mindset fully explains why Sellers did not issue a recall, warn consumers, or even modify their design moving forward. Instead, according to Dr. Glancey's analysis of current urns on the market, Sellers continue to manufacture and sell the same ticking time bomb with the same fundamental defects to this day. Sellers' inexcusable, intentional, and reckless conduct more than justifies a substantial award of punitive damages.

### Claims for Relief

### COUNT I
### (Against Sellers)
### (Strict Product Liability—Design and/or Manufacturing Defect)

101.    Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 100 as if fully set forth herein.

102.    The Urn and its component parts were defectively designed and/or manufactured by Sellers.

103.    The Urn and it parts were unreasonably dangerous when Sellers placed them into the stream of commerce because they were designed and/or manufactured: (a) with screws rather than a nut and bolt arrangement with far greater strength; (b) with plastic handles that were not rated for the temperatures to which they would be routinely exposed; and (c) with an inadequate safety lid that does not prevent spillage when the Urn's handles fail.

104.    The Urn failed to operate as safely as consumers would expect when it was used in a highly foreseeable manner.

Case ID: 241003234

105. The high risk of catastrophic failure inherent in Sellers' design substantially outweighed the negligible benefits, if any, of that design due to the risk of injury from the defective handles and lid design, as evidenced by this and other tragedies (or near tragedies), and there were readily available alterative designs that would have maintained the Urn's utility without additional or with reasonable additional expense.

106. As a direct and proximate result of the Urn's product defects, as more fully described herein, Mrs. Seidman suffered and continues to suffer from severe bodily and emotional injuries, including but not limited to pain and suffering, which have impaired her ability to live her life in a normal fashion free from significant pain.

107. As a direct and proximate result of the Urn's product defects, Mrs. Seidman incurred substantial medical bills and expenses.

108. Sellers' conduct was "intentional, willful, wonton or reckless" for failing to recall the Urn or, at the minimum, warn consumers of the risk that the Urn's handles could suffer a catastrophic failure without warning. Sellers took no action for evil motives by seeking profits over the health and safety of customers.

**COUNT II**
**(Against Hamilton)**
**(Strict Product Liability—Failure to Warn)**

109. Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 108 as if fully set forth herein.

110. Hamilton failed to provide any warning informing the Urn's users about the extreme risk of injury presented by carrying the Urn using its plastic handles.

111. To the contrary, Hamilton advertised its handles as "stay[ing] cool to the touch for comfort" and its lid as "lock[ing] in place to eliminate spills," leading Ms. Seidman and others to

20

Case ID: 241003234

believe that carrying the Urn while it contained hot water was a permissible and safe use of the Urn.

112.    As a direct and proximate result of Hamilton's failure to warn the public of the Urn's product defects, as more fully described herein, Mrs. Seidman suffered and continues to suffer from severe emotional and bodily injuries, impairments, harms, and losses, including but not limited to pain and suffering, which have impaired her ability to live her life in a normal fashion free from significant pain.

113.    As a direct and proximate result of Hamilton's failure to warn, Mrs. Seidman incurred substantial medical bills and expenses.

114.    Hamilton's conduct was "intentional, willful, wonton or reckless" for, among other reasons, it intentionally failed to warn consumers or recall the defective Urn after being placed on notice of the defect.

**COUNT III**
**(Against Hamilton)**
**(Breach of Express Warranty)**

115.    Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 114 as if fully set forth herein.

116.    Hamilton expressly and prominently represented that the Urn's lid "locks in place to *eliminate* spills." (emphasis added).

117.    This is a statement of fact, relied upon by Mrs. Seidman, that formed part of the basis of the bargain when she purchased the Urn. Thus, Hamilton expressly warranted that the Urn would "eliminate spills." It did not, in fact, "eliminate spills" because the locking mechanism necessarily fails when the Urn's handles detach. In reliance on this representation, Mrs. Seidman

21

Case ID: 241003234

purchased and ultimately used the Urn in accordance with the directions for its use provided by Hamilton.

118.    As a direct and proximate result of Hamilton's breach of its express warranty, Mrs. Seidman suffered and continues to suffer from severe emotional and bodily injuries, impairments, harms, and losses, including but not limited to severe pain and suffering, which have impaired her ability to live her life in a normal fashion free of significant pain.

119.    As a direct and proximate result of Hamilton's breach of its express warranty, Mrs. Seidman incurred substantial medical bills and expenses.

120.    Hamilton's conduct was "intentional, willful, wonton or reckless" for, among other reasons, it has failed to warn consumers or recall the defective Urn after being placed on notice of its breach of its warranty.

**COUNT IV**
**(Against Hamilton)**
**(Breach of Implied Warranties)**

121.    Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 120 as if fully set forth herein.

122.    Hamilton impliedly warranted that the Urn was of merchantable quality and safe for its intended use.

123.    Mrs. Seidman relied on these implied warranties when she purchased the Urn, which formed the basis of the bargain between her and Hamilton.

124.    Hamilton breached these implied warranties because the Urn, rather than being safe, was unreasonably dangerous when used in its intended manner.

125.    As a direct and proximate result of Hamilton's breach of its implied warranties, Mrs. Seidman suffered and continues to suffer from severe emotional and bodily injuries,

Case ID: 241003234

impairments, harms, and losses, including but not limited to pain and suffering, which have impaired her ability to live her life in a normal fashion free from significant pain.

126. As a direct and proximate result of Hamilton's breach of its implied warranties, Mrs. Seidman incurred substantial medical bills and expenses.

127. Hamilton's conduct was "intentional, willful, wonton or reckless" for, among other reasons, it intentionally failed to warn consumers or recall the defective Urn after being placed on notice of its breach of its warranty.

## COUNT V
### (Against Sellers)
### (Negligence)

128. Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 127 as if fully set forth herein.

129. Sellers, as the designers, manufacturers, and sellers of the Urn, had a duty to consumers to design and manufacture the Urn in a reasonably safe manner.

130. The Urn and it parts were unreasonably dangerous when Sellers placed them into the stream of commerce because they were designed and/or manufactured: (a) with screws rather than a nut and bolt arrangement with far greater strength; (b) with plastic handles that were not rated for the temperatures to which they would be routinely exposed; and (c) with an inadequate safety lid that does not prevent spillage when the Urn's handles fail.

131. The grave risk of harm inherent in the Urn's design substantially outweighed the negligible benefits, if any, of that design as the risk of injury due to the defective handles and lid design were significant, as evidenced by this tragedy and others, and there were ample alterative designs that would fully maintain the Urn's utility without much, if any, additional expense.

Case ID: 241003234

132.    As a direct and proximate result of Sellers' negligence, as more fully described herein, Mrs. Seidman suffered and continues to suffer from severe emotional and bodily injuries, impairments, harms, and losses, including but not limited to pain and suffering, which have impaired her ability to live her life in a normal fashion free from significant pain.

133.    As a direct and proximate result of Sellers' negligence, Mrs. Seidman incurred substantial medical bills and expenses.

134.    Sellers' conduct was "intentional, willful, wonton or reckless" for, among other reasons, their intentional failure to warn consumers or recall the defective Urn after being placed on notice of its many serious defects.

## COUNT VI
### (Against Hamilton)
### (Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law)

135.    Mrs. Seidman incorporates herein the allegations in Paragraphs 1 through 134 as if fully set forth herein.

136.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-1 *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," *id.* § 201-3(a).

137.    Relevant here, the UTPCPL defines "unfair methods of competition and unfair or deceptive acts or practices" as:

    a.  "Representing that goods or services are of a particular standard, quality or grade . . . , if they are of another," *id.* § 201-2(4)(vii);

    b.  "Advertising goods or services with intent not to sell them as advertised," *id.* § 201-2(4)(ix);

    c.  "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made," *id.* § 201-2(4)(xiv); and

24

Case ID: 241003234

d.  "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi).

138.  As alleged herein, the Urn was falsely and misleadingly advertised and warranted to contain a lid locking mechanism that would "eliminate spills."

139.  The Urn's lid did not, in fact, "eliminate spills" because the locking mechanism fails when its handles detach, as they did here. Worse yet, Hamilton knew from prior incidents that the lid did not eliminate spills when the handles failed yet it continued to assure the public that the lid eliminated spills.

140.  Hamilton also engaged in deceptive conduct by failing to disclose known, dangerous, and material latent defects in the Urn.

141.  In reliance on these false and misleading claims and omissions, Mrs. Seidman purchased the Urn believing it was safe for its intended use.

142.  By its false and misleading claims and omissions, Hamilton was able to charge a premium for the Urn.

143.  But for Hamilton's false and misleading claims and omissions, Mrs. Seidman would not have purchased or paid as much for the Urn.

144.  As a direct and proximate result of Hamilton's false and misleading claims and omissions, Mrs. Seidman believed it was safe to carry the Urn with hot liquid and resultingly suffered and continues to suffer from severe emotional and bodily injuries, impairments, harms, and losses, including but not limited to pain and suffering, which have impaired her ability to live her life in a normal fashion free from significant pain.

145.  As a direct and proximate result of Hamilton's false and misleading claims and omissions, Mrs. Seidman reasonably and quite understandably believed it was safe to carry the Urn while it contained hot liquid and resultingly incurred substantial medical bills and expenses.

Case ID: 241003234

146. Hamilton's conduct was "intentional, willful, wonton or reckless" for, among other reasons, it intentionally failed to warn consumers of the Urn's many defects or recall the Urn after being placed on notice of its false and misleading claims and omissions.

**COUNT VII**
**(Against Sellers)**
**(Loss of Consortium)**

147. Rabbi Seidman incorporates herein the allegations in Paragraphs 1 through 146 as if fully set forth herein.

148. Rabbi and Mrs. Seidman have been married for 44 years.

149. As a direct and proximate result of Sellers' tortious conduct, as more fully described herein, Rabbi Seidman has suffered a loss of Mrs. Seidman's companionship, services, affection, and society.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Sellers in an amount in excess of $50,000, for compensatory damages, treble damages pursuant to UTPCPL, 73 Pa. Stat. § 201-9.2(a), punitive damages, interests, costs, delay damages, attorneys' fees, and such other further relief that this Court deems just and proper, as permitted by law.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues involved in this case which may be tried before a jury.

Case ID: 241003234

Dated: October 24, 2024

Respectfully submitted,

*/s/ Scott D. Livingston*
Scott D. Livingston
PA ID No. 60649
Matthew B. Simon
PA ID No. 331106

MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758

*Counsel for Plaintiffs Teresa Seidman and Elimelech Seidman*

27

Case ID: 241003234

## VERIFICATION

I, Teresa Seidman, have read the foregoing Complaint in Civil Action. I verify that the statements of fact in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S, Subsection 4904, relating to unsworn falsification to authorities.

Dated: October 23 2024

Teresa Seidman



*Filed and Attested by the Office of Judicial Records 24 OCT 2024 12:36 pm L. BREWINGTON*

# EXHIBIT 1

Case ID: 241003234

FILED: QUEENS COUNTY CLERK 07/20/2022 09:55 AM
NYSCEF DOC. NO. 1

INDEX NO. 714976/2022
RECEIVED NYSCEF: 07/20/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

---------------------------------------X

MINA BEZALEL,

                         Plaintiff,

        -against-

HAMILTON BEACH BRANDS, INC.,

                         Defendant.

---------------------------------------X

Index No.:

Plaintiff designates
Queens County as
the place of trial

**SUMMONS**

The basis for venue
is Plaintiff's
residence

To the above named defendant:

        **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action
and to serve a copy of your answer, or, if the Complaint is not
served with this Summons, to serve a Notice of Appearance, on
Plaintiff's attorney within 20 days after the service of this
Summons, exclusive of the day of service (or within 30 days after
the service is complete if this Summons is not personally delivered
to you within the State of New York); and in case of your failure
to appear or answer, judgment will be taken against you by default
for the relief demanded in the Complaint.

Dated:    Rye, New York
          July 20, 2022

                                        Terrence E. McCartney
                                        McCartney Stucky LLC
                                        Attorneys for Plaintiff
                                        350 Theodore Fremd Avenue
                                        Suite 140
                                        Rye, New York 10580
                                        (914) 305-5555

TO:

Hamilton Beach Brands, Inc.
4421 Waterfront Drive
Glen Allen, VA 23060-3375

Case ID: 241003234

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
----------------------------------------X
MINA BEZALEL,                                          Index No.:
                              Plaintiff,
        -against-
                                                       **VERIFIED**
                                                       **COMPLAINT**

HAMILTON BEACH BRANDS, INC.,

                              Defendant.
----------------------------------------X

Plaintiff, by and through her attorneys, McCartney Stucky LLC, upon information and belief, alleges that:

### GENERAL ALLEGATIONS

1. Plaintiff MINA BEZALEL, at all times mentioned was and is a resident of Queens County, New York.

2. Defendant HAMILTON BEACH BRANDS, Inc. (hereinafter referred to as "HAMILTON BEACH") was and is a Delaware Corporation with its principal place of business located at 4421 Waterfront Drive, Glen Allen, VA 23060-3375.

3. Defendant HAMILTON BEACH is authorized to do and does business in the State of New York.

4. Defendant HAMILTON BEACH designed, manufactured, assembled, tested, labeled, inspected, marketed, distributed, monitored, promoted and sold the product that is the subject of this lawsuit, a Hamilton Beach 45 Cup Coffee Urn - Model: 40515R (hereinafter

Case ID: 241003234

the "subject kettle"), which Plaintiff operated, and became injured while using, on or about April 17, 2022.

5. At all relevant times, Defendant HAMILTON BEACH transacted and still transacts business within the State of New York.

6. At all relevant times, Defendant HAMILTON BEACH contracted and contracts to supply goods within the State of New York.

7. At all relevant times, Defendant HAMILTON BEACH committed tortuous acts outside of the State of New York causing injury to persons in the State of New York.

8. At all relevant times, Defendant HAMILTON BEACH regularly does and solicits business and engages in a persistent course of conduct and derives substantial revenue from goods used or consumed or services rendered, within the State of New York.

9. At all relevant times, Defendant HAMILTON BEACH expected or should reasonably expect its acts to have consequences within the State of New York.

10. At all relevant times, Defendant HAMILTON BEACH derived and still derives substantial revenue from interstate and international commerce.

11. Defendant HAMILTON BEACH was the manufacturer and designer of the subject kettle.

Case ID: 241003234

12.  Defendant HAMILTON BEACH distributed the subject kettle under the brand name "Hamilton Beach."

13.  On or about May 15, 2019, Plaintiff purchased the subject kettle on Amazon.com, and it was subsequently delivered to her on or about May 17, 2019.

14.  On or about April 15, 2022, Plaintiff plugged the subject kettle into an electrical outlet and used it to heat hot water for tea, one of its listed uses, over the Passover holiday, April 15-17, 2022.

15.  Plaintiff securely attached the subject kettle's twist-lock lid after filling it with water at the outset of the heating cycle on April 15, 2022.

16.  Plaintiff kept the subject kettle plugged in and turned on during this time period, as was her weekly practice since the date of purchase.

17.  Plaintiff refilled the subject kettle several times over the Passover holiday, always properly securing the twist-lock lid after each refill.

18.  During the period of April 15-17, 2022, the subject kettle's heating element was never operated without water in the subject kettle's tank; Plaintiff always refilled the tank before it ran completely dry.

Case ID: 241003234

NYSCEF DOC. NO. 1

INDEX NO. 714976/2022

RECEIVED NYSCEF: 07/20/2022

19. Defendant does not warn against, nor limit, the continuous operation of the subject kettle for any amount of time.

20. Had Defendant warned against continuously operating the subject kettle for longer than a twelve-hour period, Plaintiff would not have purchased or used the subject kettle.

21. At approximately 8:00 P.M., on or about April 17, 2022, Plaintiff unplugged the subject kettle and then picked it up by its plastic handles to carry it to the kitchen sink to empty out the water; also her regular weekly practice for almost three years. At the time, the subject kettle was about three-quarters full of scalding hot water.

22. While Plaintiff was carrying the subject kettle to the kitchen sink, the plastic handles suddenly detached from the kettle's tank and it dropped to the floor.

23. Each plastic handle was secured to the subject kettle's metal tank with two small metal screws.

24. When the subject kettle dropped to the floor, the scalding hot water from inside the tank spilled onto Plaintiff's ankles, feet and shins.

25. Plaintiff's family called 911, and at approximately 8:30 P.M., on or about April 17, 2020, an ambulance arrived at her house

and took her to North Shore University Hospital for treatment where she was diagnosed with severe burns to her ankles, feet and shins.

26. On or about April 19, 2022, Plaintiff began follow-up treatment at the Cornell Burn Center outpatient program and would spend the next 10 days in that program treating her burn injuries.

27. Plaintiff continues to suffer pain and scarring from her burns several months after the incident.

28. On its website and elsewhere, Defendant HAMILTON BEACH advertises the plastic handles and twist-lock lid as safety features designed to reduce spills and make carrying easy.

29. On Amazon.com, where Plaintiff purchased the subject kettle, Defendant advertises its handles and twist-lock lid as safety features that allows for easier transport "without spillage."

30. At all times, Plaintiff was a foreseeable user of the subject kettle and used it in a foreseeable manner.

31. Plaintiff's injuries were a direct result of the subject kettle's plastic handles detaching, which caused the tank of scalding hot water to drop to the floor, the twist-lock lid to come off and the scalding hot water to spill onto her.

32. Plaintiff's injuries were also directly caused by the safety twist-lock lid's failure to remain attached to the subject kettle after the handles detached. The twist-lock lid is designed with

Case ID: 241003234

grooves that "lock" under the handles and purport to create a spill-proof seal when secured. As such, when the handles detached from the subject kettle, the twist-lock lid was no longer secured and did not prevent scalding hot water from spilling and injuring Plaintiff.

33.  The subject kettle did not possess any secondary safeguards to prevent the plastic handles from detaching from the subject kettle.

34.  The subject kettle did not possess any secondary safeguards to prevent the twist-lock lid from falling off in the event that the plastic handles failed.

## FIRST CAUSE OF ACTION - STRICT PRODUCT LIABILITY

35.  Plaintiff repeats and realleges paragraphs 1 through 34.

36.  The subject kettle and its parts and components, were defectively designed, manufactured, assembled, tested, labeled, inspected, marketed, distributed, monitored, promoted, sold, serviced and maintained by Defendant HAMILTON BEACH.

37.  The subject kettle and its parts and components were defective and unreasonably dangerous when Defendant placed it into the stream of commerce because: a) The subject kettle was designed with poorly constructed plastic handles that did not securely attach to the subject kettle's tank and were susceptible to detaching from the

Case ID: 241003234

tank while in use; b) The subject kettle was designed with an inadequate safety lid that does not prevent spillage when the handles of the subject kettle are compromised or missing, and; c) Defendant failed to provide adequate warnings or instructions informing foreseeable users about the risks, dangers and harms presented by the subject kettle. Specifically, Defendant failed to warn against the dangers of continuously operating the subject kettle for extended periods of time, the dangers of moving the subject kettle while it contained hot liquids and the danger of using only the plastic handles as hold points when moving the subject kettle.

38. Defendant knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the subject kettle and its parts and components, whose defective design and manufacturing caused the kettle to fall to the ground and spill scalding hot water onto the Plaintiff.

39. The defects in the subject kettle and its parts and components were a proximate cause of the damages suffered by the Plaintiff.

40. By engaging in said conduct, Defendant HAMILTON BEACH is strictly liable to the Plaintiff.

41. Said conduct of Defendant was so willful, wanton, malicious, reckless and in such disregard for the consequences as to reveal

Case ID: 241003234

a conscious indifference to the clear risk of death or serious bodily injury and merits the imposition of punitive damages.

### SECOND CAUSE OF ACTION - BREACH OF WARRANTY

42. Plaintiff repeats and realleges paragraphs 1 through 41.

43. Defendant warranted and represented, both expressly and impliedly, that the subject kettle was reasonably safe, fit for its intended purpose and reasonably foreseeable uses and of merchantable quality.

44. Plaintiff relied upon the skill and judgment of Defendant and upon the aforesaid warranties and representations and expected that the subject kettle was reasonably safe.

45. Defendant's representations and warranties were false and misleading and were breached because the subject kettle was defective, hazardous, dangerous, not reasonably safe, not fit for its intended or reasonably foreseeable uses, not of merchantable quality and did not meet the expectations of consumers, including Plaintiff's.

46. Thus, Defendant breached its express and implied warranties.

47. The Defendant's breaches were a proximate cause of the damages suffered by the Plaintiff.

Case ID: 241003234

FILED: QUEENS COUNTY CLERK 07/20/2022 09:55 AM
INDEX NO. 714976/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 07/20/2022

## THIRD CAUSE OF ACTION - NEGLIGENCE

48. Plaintiff repeats and realleges paragraphs 1 through 47.

49. Defendant HAMILTON BEACH was negligent in designing, manufacturing, assembling, testing, labeling, inspecting, marketing, distributing, monitoring, promoting, selling, servicing and maintaining the subject kettle, its parts and components.

50. Upon information and belief, Defendant was aware of the defects in the subject kettle and its parts and components, through numerous other similar incidents, lawsuits, customer complaints, reports and other sources but negligently failed to take the appropriate steps to redesign the subject kettle, its parts and components or warn Plaintiff and the public of the risks associated with the same. Moreover, Defendant continued to sell the subject product, even after being put on notice of serious injuries resulting from its use.

51. The aforementioned negligence was a proximate cause of the damages suffered by the Plaintiff.

52. Defendant HAMILTON BEACH is therefore liable to the Plaintiff.

53. The conduct of Defendant was so willful, wanton, malicious, reckless and in such disregard for the consequences as to reveal

Case ID: 241003234

Case 2:24-cv-06033-FGAW-nen Document 1 Filed 10/27 Filed Page 12/24 of Page 44 of 53 19 INDEX NO. 714976/2022

a conscious indifference to the clear risk of death or serious bodily injury and merits the imposition of punitive damages.

## CPLR 1602 EXCEPTIONS

54. Plaintiff's lawsuit falls within one or more of the enumerated exceptions of article 1602 of the CPLR, specifically subdivisions 1602(2), 1602(7) and 1602(10).

WHEREFORE, Plaintiff demands judgment against the Defendant, severally and jointly:

a. Compensatory damages on each Cause of Action;

b. Punitive damages on Cause of Action One and Three;

c. All together with interest, costs and disbursements; and

d. Such other and further relief as this Court deems just and proper.

Dated: Rye, New York
July 20, 2022

Terrence E. McCartney
McCartney Stucky LLC
Attorneys for Plaintiff
350 Theodore Fremd Avenue
Suite 140
Rye, New York 10580
(914) 305-5555

Case ID: 241003234

FILED: QUEENS COUNTY CLERK 07/20/2022 09:55 AM INDEX NO. 714976/2022
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/20/2022

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF WESTCHESTER    )


    Terrence E. McCartney, an attorney admitted to practice law before the Courts of the State of New York, hereby affirms as true under the penalties of perjury that affiant is the attorney of record for the within action; that affiant has read the foregoing Complaint and knows the contents thereof; that same is true as to affiant's own knowledge, except as to those matters therein stated to be alleged on information and belief and as to those matters, affiant believes same to be true. Affiant further states that the reason this affirmation is made by affiant and not by plaintiff is that affiant's office for the practice of law is located in a different county than that of plaintiff's residence.

    The grounds of affiant's belief as to all matters not stated upon affiant's knowledge are as follows: statements made by plaintiff and affiant's own general investigation into the facts and circumstances of this action.

Dated:    Rye, New York
           July 20, 2022

                                    Terrence E. McCartney

Case ID: 241003234



*Filed and Attested by the*
*Office of Judicial Records*
*24 OCT 2024 12:36 pm*
*L. BREWINGTON*

# EXHIBIT 2

Case ID: 241003234



Terrence McCartney
*Licensed in NY & CA*

Rhett Wallace
*Licensed in VA*

Christopher Stucky
*Licensed in MO, KS, & NY*

Austin Osborn
*Licensed in MO & NY*

September 28, 2022

**By Hand**
Catherine G. Bryan
Connell Foley LLP
1085 Raymond Blvd., 19th Floor
Newark, New Jersey 07102

> **Re:** **Bezalel v. Hamilton Beach Brands, Inc.**
> **Index No. 714976/2022**

Dear Catherine,

I am writing to provide you with Plaintiff's demand to settle her claims against your client, Hamilton Beach Brands, Inc. (hereinafter referred to as "Hamilton Beach"). **Plaintiff's demand to settle her claims against Hamilton Beach is $900,000.**

This is a straightforward case that should settle early. Liability is based upon the clear defects in the subject product, a Hamilton Beach 40515R coffee urn, that Plaintiff Mina Bezalel used to heat water for her family over the 2022 Passover holiday. Due to multiple defects in the design and construction of the urn's handles and lid, the handles broke while Mina was carrying the urn which was filled with hot water. The handles separated completely from the urn, causing it to fall from Mina's hands and the lid to become unsecured. As a result, the urn crashed to the floor and released its scalding hot water onto Mina's legs, ankles and feet causing her to suffer severe burns.

In addition to the design defects, Hamilton Beach also provided no warnings of the dangers associated with prolonged use of the urn and the potential for the handles to degrade over time and break away from the urn under such conditions. In terms of product safety, the design of the urn and its lack of warnings evidence a negligent disregard for user safety. The design defects in the urn are clear and simple for a jury to understand. Likewise, the alternative designs are basic and economically feasible. As the designer and manufacturer of the subject coffee urn, Hamilton Beach is strictly liable to Mina for her injuries.

---

Rye, New York
350 Theodore Fremd Avenue, Ste. 140
(914) 305-5555

Lenexa, Kansas
8711 Penrose Lane, Ste. 310
(816) 994-4040

Case ID: 241003234

As defense counsel has already discovered and disclosed to the court, verdicts and settlements for injuries similar to Mina's average around $1,867,500 and have reached as high as $3,350,000 for pain and suffering alone. This is the type of case that should be resolved before both sides incur unnecessary discovery and expert witness costs. To that end, we have kept our demand well below what this case could be worth at trial. I hope that you will respond in kind, and we can work together to resolve this case.

### Basic Facts

Mina Bezalel is a 57-year-old, Orthodox Jewish woman. She was severely injured when scalding hot water burned her legs, ankles and feet because the handles of the subject coffee urn suddenly broke away from the urn while Mina was carrying it.



**Exemplar of the subject Hamilton Beach 40515R Coffee Urn with handles still attached.**

As a member of the Orthodox Jewish faith, Mina and her family observe the holiday of Passover. As you may know, in Orthodox communities, the last two days of Passover are considered holy days and the rules of the Sabbath are observed. During that time, turning on or turning off an appliance that uses electricity is prohibited. Therefore, in order to have hot water for tea, Mina and her family used the subject urn to heat and maintain hot water from April 15, 2022, to the end of Passover on April 17, 2022. During that period, Mina left the subject coffee

2

Case ID: 241003234

urn plugged in and turned on, periodically refilling the water as it ran low. Nothing on the subject coffee urn or its packaging, nor anything in the user's manual, warned that Mina's actions were dangerous or inadvisable.

After Passover ended on the evening of April 17 Mina unplugged the urn and started to carry it to the sink. The urn was still hot, so Mina used the handles to carry it as the user's manual instructed. As she was carrying the urn, both handles suddenly broke off of the urn completely. The urn fell to the ground and, despite the locking lid allegedly designed to prevent spills, splashed Mina with scalding hot water and caused serious burns to her legs, ankles and feet. She was rushed to North Shore University Hospital by ambulance, where she was treated for her injuries. On April 19, Mina began a ten-day outpatient program at the Cornell Medical Center for follow-up treatment of her burns.



**Mina's burns before and after debridement.**

## Theory of the Case

As discussed earlier, the design defects of the subject coffee urn and its handles are readily apparent. First and foremost, the screws used to secure the handles to the subject coffee urn were inadequate for the intended use of the urn. It is foreseeable that users will carry the subject coffee urn while it is full of water or coffee. However, each handle is only secured to the subject coffee urn by two short screws passing through the metal walls of the urn and into prefabricated ports in the plastic handles. Our materials science expert, Dr. James Glancey from the University of

3

Case ID: 241003234

Delaware, has conducted an initial evaluation of the subject coffee urn. We anticipate that he will testify that the small screws were too short to provide the amount of contact and hold necessary to properly anchor the handles to the subject coffee urn's wall and were therefore inadequate for the intended use of the product. Further, we anticipate that Dr. Glancey will testify that this defect was easily fixed. Indeed, a simple and inexpensive alternative design, such as using a nut, bolt and washer arrangement instead of two short screws, would have prevented the handles breaking off the subject coffee urn and would have prevented Mina's injuries altogether.



**The subject coffee urn with handles missing. The screws are outlined in red.**

Second, the handles are disintegrating. The damage to the handles extends not only to the edges where the handles contacted the metal wall of the subject coffee urn, but also to the prefabricated ports where the screws connected the urn to the handles. This damage further compromised the ability of the already inadequate screws to secure the handles and increased the handles susceptibility to failure. While the exact type of material used to manufacture the handles will be the subject of discovery and testing, it is evident that the material used to construct the handles was inadequate to withstand the thermal cycling to which the handles were regularly and foreseeably subjected. The weakened material likely contributed to the failure of the handles and Mina's injuries.

4

Case ID: 241003234



**Degraded handles and material debris**

Third, the subject coffee urn's locking lid, which Hamilton Beach advertised would "eliminate spills," failed to do so in this case because its ability to stay latched to the top of the subject coffee urn was entirely dependent on the presence of the handles. The lid is designed to lock under a lip on the handles. In situations where the handles break off the subject coffee urn entirely, nothing remains to secure the lid to the top of the urn, thereby allowing the heated liquid to escape and injure users like Mina. Hamilton Beach failed to provide a secondary safety mechanism to ensure that the lid remained secured in place in the event that the handles broke while carrying the subject coffee urn. Its failure to account for this foreseeable failure mode is negligence which contributed to the defective design of the subject coffee urn and Mina's injuries.

- The handles stay cool to the touch for comfort, and the lid on the large coffee maker locks in place to eliminate spills

**Excerpt from subject coffee urn's product page on Amazon.com.**

Finally, there were no warnings provided with the subject coffee urn regarding how long the urn should be left on or the dangers associated with carrying the urn by the handles while it was filled with heated water. Had such warnings been provided, Mina would not have used the subject coffee urn in the way she did and would not have sustained her injuries.

5

Case ID: 241003234

## Liability

As you know, under New York's product liability law Hamilton Beach is strictly liable for any design or manufacturing defect in the subject coffee urn. If this case makes it to trial, we plan to present Hamilton Beach's liability in a clear and concise manner that the jury will easily understand. As outlined above, Hamilton Beach secured the urn's handles with screws that were too short. As a result, the handles were prone to catastrophic failure when users carried the urn while it was filled with hot water or coffee. Hamilton Beach exacerbated the problem by using cheap, brittle material for the urn's handles, which could not withstand the heat to which it was regularly and foreseeably subjected. Further, Hamilton Beach designed a lid that relied on the cheap handles to "eliminate spills." When the handles foreseeably failed, there was no backup mechanism to ensure that the lid stayed secured to the urn. Finally, Hamilton Beach didn't warn users like Mina about the potential dangers of carrying the urn by the handles while it was filled with hot water or of leaving the urn plugged in for an extended period of time. In short, Hamilton Beach did the bare minimum to get this coffee urn to market, endangering its customers in the process.

Unlike many of our cases, this will not come down to a battle of the experts; the problems in Hamilton Beach's design are readily apparent and easy to understand. Likewise, a jury will easily grasp the simple and cost-effective alternative designs we propose, such as using nuts and bolts instead of screws to secure the handles, manufacturing the handles using higher grade, heat-resistant material and incorporating a lid with a secondary latching mechanism. Further, Hamilton Beach could have provided basic instructions regarding how long the subject coffee urn can safely be left on and a simple warning not to carry the urn while full of heated water.

This is a simple case which a jury will easily understand. Hamilton Beach's liability is clear and a jury will want to hold Hamilton Beach accountable for its disregard of customer safety.

## Damages

As it is still early in the case, we do not have a complete account of Mina's incurred medical expenses[1]. However, to this day Mina is still experiencing a burning sensation and pain in the areas where she was most severely burned. It is too early to tell if this pain will resolve on its own or if it will require further medical intervention. Suffice it to say Mina's medical expenses may continue to grow as time moves on.

Beyond her medical expenses, Mina experienced tremendous pain and suffering during the subject incident and has continued to experience significant pain ever since. Mina sustained first and second degree burns on her legs, ankles and feet. Burns are some of the most painful injuries there are, especially when they cover large areas and even small first-degree burns can be extremely painful. In our experience, having handled many burn injury cases, jurors typically appreciate the pain and suffering associated with burn injuries and tend to be sympathetic to burn victims.

---

[1] Enclosed herewith are the medical billing records we have collected thus far. We will continue to provide you with such records as we receive them.

Case ID: 241003234

Of course, you already know this from your own verdict and settlement research. *Parris v. Sharded Equities, Co.*, 281 A.D.2d 174 (N.Y. App. Div. 2001) (affirming jury verdict of $2,250,000 for past pain and suffering and $1,000,000 for future pain and suffering for severe scalding burns to Plaintiff's legs and feet); See also *Neissel v. Rensselaer Polytechnic Inst.*, 54 A.D.3d 446, 453 (2008) (upholding $3,600,000 award for electrical burns to 7% of Plaintiff's body). At trial we will claim that Mina's damages are $500,000 for past pain and suffering and twice that for future pain and suffering, for a total of $1,500,000. Obviously, a jury could award much higher damages, and based on Hamilton Beach's blatant disregard for the safety of its customers, a jury could easily do so.

However, at this early stage of the litigation, Plaintiff's demand is $900,000, well below the trial value of the case in an effort to facilitate early resolution. I hope that you will respond in kind.

## Summary

Mina is a kind, humble woman who just wanted to make sure that her family had a nice Passover holiday. Unfortunately, she chose to use the Hamilton Beach 40515R and because of the urn's defective design, the holiday turned into a nightmare. Her scars will always remind her of that Passover and the incident that ruined it.

This is a simple case. The defects are clear. The liability is clear. The damages are clear. We have made a reasonable demand and the time to settle this case is now, before we both spend significantly more money and time on it leading up to and at trial. I look forward to speaking with you if you are interested in trying to resolve this matter. Please feel free to call.

Cordially,

Terrence E. McCartney

7

Case ID: 241003234